The next case called Agenda No. 15, Docket Numbers 121, 302, 304, 305, and 308, Illinois Landowners Alliance and Others v. Illinois Commerce Commission and Others. I understand that Mr. Harvey and Mr. McBride, on behalf of the appellants, you're going to divide your time both on direct and rebuttal. And Mr. Price and Mr. Reagan, you're dividing your time. You will each be responsible for keeping track of your own time. The clerk will alert the last when the 20 minutes is up. You may proceed. May it please the court and counsel, my name is Matthew L. Harvey. I'm the Special Assistant Attorney General representing the Illinois Commerce Commission. Also representing appellants is Owen B. McBride representing Rock Island Clean Line LLC. In addition to the Commission on Rock Island, appellants include the International Brotherhood of Electrical Workers, Wind on the Wires, a trade organization representing wind farm developers, the Natural Resources Defense Council, and the National Environmental Group. Amicus supporting reversal of the health court decision include the Citizens Utility Board, the people of the state of Illinois by and through the Attorney General of Illinois, Lisa Madigan, Infinity Wind Power, a developer of wind farms and LSP transmission holdings, and independent non-incumbent developer of transmission lines similar to Rock Island. The amicus briefs point out the adverse public policy implications of letting the appellate court decision become the law of the state. As you know, this case is an appeal from an administrative agency decision and reviews of agency decisions are, which are reviewing not the lower court decision. While the appellate court decision was wrong in several significant ways, the question for this court is fundamentally, are the Commission's findings of fact and determinations based on substantial record evidence and a reasonable application and interpretation of the Commission's enabling statute, Public Utilities Act. I'll discuss the standard of review and the Commission's proper exercise of its discretion in granting Rock Island a certificate of public convenience and necessity, which I will refer to as a certificate or CTCM. I'll also discuss the Commission's finding that the Rock Island project is for public use and why that finding is correct, why it's supported by substantial evidence, and why it's entitled to deference. Mr. McBride will discuss the public use section as well and will discuss the substantial record evidence that supports the Commission's findings of fact in granting Rock Island a certificate. The Commerce Commission requests that this court reverse the appellate court decision and affirm the Commerce Commission's decision. With respect to the standard of review, generally this court should review Commission decisions using a substantial evidence standard under which the Commission's findings are entitled to deference and need only be supported by substantial record evidence. And to be clear, our position is that regardless of the standard of why the Commission's order should be affirmed in this case, should this court decide that the matter is a mixed question of law and fact, it's clear that the Commission's decision was not clearly erroneous in that no definite and firm conviction can be found that the Commission erred. In the event of the Dovo review, the Commission's reasonable construction of its own enabling statute, which is enforced for nearly 100 years, is entitled to substantial deference. With respect to the Commission's determination that Rock Island was not required to possess utility facilities at the time it sought certification, the Commission's decision was a reasonable interpretation of its enabling statute, which, as I said, it's enforced for many years. It recognized that requiring a new utility to own or possess facilities at the time of its application for a certificate requires that utility to violate Section 8406 of the Illinois Public Utilities Act, which is the very statute pursuant to which it seeks certification. The Commission found that the relevant inquiry was whether the applicant complied with Section 8406B of the Act, which deals with the project itself. The Commission properly read Sections 3105 and 8406A and B together and determined that requiring an applicant to possess utility facilities at the time it sought a certificate was simply unreasonable. In other words, the Commission found that the applicant's proposed project is what needs to be analyzed, the plans, the projections, and in the business case that it presents, as well as its ability to manage, finance, and construct the facilities. This interpretation is a reasonable interpretation and it's entitled to deference. With respect to the Commission's determination that Rock Island's proposed offering of transmission service is a public use, this turns on the question of whether Rock Island will offer its transmission facilities for use by the public without undue discrimination. The Commission found the answer to this is yes, and this finding is based on substantial record evidence and a reasonable interpretation of the Commission's enabling statute and should be affirmed. This Court has long held that in the Reviewing Commission decisions, a Reviewing Court should not substitute its judgment for that of the Commission, and that's regrettably what happened in the Appellate Court. It's well established that the Commission's decisions need to only be supported by substantial evidence, which is that which a reasoning mind would accept more than a mere scintilla, but perhaps less than a preponderance. And it's required that for rehearsal under a substantial evidence standard that the opposite conclusion to that reached by the Commission is clearly evident. Now the deferential standard is applicable to the question of whether a public use exists here. This is a question of fact. Now the parties have referred the Court's attention to a number of cases regarding what, in fact, the attributes of a public utility are and what the characteristics of a public utility are. And the rule that we would hope you would extract from these cases, and we think it's the correct rule, is that the most significant factor is whether the utility holds itself out as a public utility by offering its services to the public without undue discrimination. It seems the theme in the other side's argument is that 75% is already committed, 25% is going to be subject to submitting process, and maybe there's nothing left for the public agenda. Would you respond to that? Well, I think, first of all, there are some Illinois cases, and I would refer to Iowa RCO versus Illinois Commerce Commission, that suggest that offering a portion of a finite amount of capacity, and all facilities that utilities use, including this one, pipelines, have, by definition, a finite amount of capacity, substantially meets the public use standard. So I think that the fact that the capacity in question is limited to a portion of the capacity for public use is, well, frankly, that satisfies the standard. As to the process whereby the capacity will be allotted, I think Mr. McBride plans to discuss that in some detail with you, but in fact, the offering is what matters. If members of the public don't take it, or if there is less than enough capacity, and if the transmission facility utility owner has processes in place that will fairly allot that capacity, I think that satisfies the public use standard. Help me to understand this, and my understanding is the AC will be converted to DC in Iowa under the proposal sent to Grundy County, Illinois, where it's reconverted to AC. How does the public get to use DC along the way, or is it only after it comes through the converter plant in Grundy County? Well, I think there'll be two public uses here, but if what you're saying is that to use the facilities, well, to move load from somewhere in Illinois, let's say, to the converter station in Grundy County, a wind farm would, as wind farms elsewhere will have to do, they would have to install facilities that would enable them to put that power on the transmission facility. So yes, there would be costs associated with that, if that's your question. And then how does the public access that? You can't just plug into the line, I guess. Does it mean public, or does it mean some other utility buys it and distributes it to the public? Well, I guess, at the risk of confusing the issue somewhat, there are two publics here. One is the universe of what are called load serving entities that generate power. Those entities will have opportunities to take part in the allocation of the 25% if they choose to do that. The public, you and I, that use electricity will benefit from that electricity being brought to the PJ and interconnection where it will mingle in with all the other electricity and will use it. Electricity being sort of a fungible commodity, and so it will be used to serve customers like you and I, and it will reduce the location of marginal price of the electricity. Can I follow through with that question, because I too have that same kind of factual question. This 25%, that's not the public's use, correct? Well, those are private entities that have an opportunity to have contracts within that 25%? They would have an opportunity to take under what's called an open access tariff, and they would be, as you say, Your Honor, what are called load serving entities, which are essentially entities that generate electricity. So the public, in terms of the open access transmission tariff, is indeed people that want to generate electricity and move it to the PJ and interconnection. Are these other public utilities or are these private entities? They could be either. More than likely they would be private entities, I would suspect, but that isn't known at this time. And so if other private entities can compete, that's a public use? If private entities, if entities that wish to use these transmission facilities can use them under terms and conditions and at rates that are not unduly discriminatory, that's the public use, Your Honor. With regard to that, if the certificate of public convenience was granted, this is still based on a proposed plan. What controls might be in place to ensure that the company complies with the statutory public use requirements? Well, there is the open access transmission tariff is one of those things. If the company is committed to observing the terms and conditions of that tariff, which the Federal Energy Regulatory Commission, which is the entity charged with assessing, at least for Federal purposes, those rates, terms, and conditions, has determined to be non-discriminatory. So Rock Island is required to observe the conditions of that non-discriminatory tariff. In addition, from a, I guess, going forward standpoint, the commission has imposed a number of conditions related to Rock Island being required to show that it's got financing in place before it begins construction. Could Rock Island then use eminent domain powers to obtain the land but never actually complete and implement the project? In my opinion, no, Your Honor. There are conditions in place that the commission has imposed on the exercise of the certificate that prevent that from happening and that are intended to prevent that from happening. And specifically, it has to demonstrate that it's able to finance the whole project before it builds any other project. Thank you. I believe I am now eating into Mr. McBride's time, so unless there are additional questions from the bench, I will merely ask and request that this Court reverse the opinion of the appellate court below and affirm the commission's decision of, I believe, November 23, 2014. Thank you very much. Thank you. Good morning. May it please the Court. I am Owen McBride, representing Rock Island Cleanline LLC. With me today are my co-counsel for Rock Island, Michael Sednowicki and Donna Bowman. Let me go directly to responding to the Chief Justice and Justice Berg's questions. First of all, and I know you don't have a physics lesson from me, but the fact that this technology that will be used for this line only provides for the injection of power in Iowa and the delivery of power in Bronte County, Illinois, is what makes it the efficient vehicle to deliver power over 500 miles. An AC line would not be able to do that. If an AC line that allowed input and offtake all along that way would have so many line losses that by the time the power was delivered to Illinois, you'd have so many losses that would be so costly that it would not be a competitive price, given both the generation cost in Iowa and the delivery cost. With that said, the customers could be identified in several segments based on the Federal Energy Regulatory Commission requirements and order. First of all, no power has been committed to anyone, so none of these processes have been enacted, and they won't until about the time that the construction would be ready to start on this project. The first segment, the so-called anchor customers, are customers who would enter into long-term contracts for service, and that could be up to 75% of the capacity. The second step is the open season, where the remaining capacity is offered to any eligible customer. The eligible customers are generators in Iowa, who would put power onto the line there, or load-serving entities in Illinois, and those could include public utilities, municipal electric utilities like the City of Naperville, and I'm not saying they're a customer, but that's an example of a municipal electric utility, wholesale cooperatives, or alternative retail electric suppliers, but these are all entities that receive bulk power because they would be interested in getting clean, low-cost, renewable energy from the wind generators in Iowa. You're looking at your yellow light, and so am I. My question is right there. So the public use piece of this will be these private entities that you've just been discussing, correct? Why is that a public use? These are members of the public, and in fact, this is the part of the public that is interested in this service. This is a specific point-to-point transmission service to meet a need that we think is unmet to efficiently and cost-effectively deliver wind energy from the best wind resource area in the country to the markets in Illinois where there's a demand for this service. Second, the public use also, and I think this is very important and is largely ignored here, is the end users who use this power. The power doesn't stop with the entities we've described. They distribute it to tens of thousands of retail customers and users in Illinois and in other states, and the Commission, in a number of previous orders for transmission-only utilities like us, their description has been that the entity is a public utility because it will be transmitting electricity for the use of the public at rates, terms, and conditions regulated by the Federal Energy Regulatory Commission. So it's delivering billions of kilowatt hours per year, enough to serve the needs of 1.4 billion households, roughly, of low-cost renewable energy that is the ultimate public use that this facility will provide. Why do you want to be a public utility? Why do you want to have the heavy regulation of the ICC? Is it because you want to use the eminent domain power? No, it's number one, it's because we think this is a public utility. The statute requires to get us a certificate, and we visited with the Commission before filing, and they said, yeah, you're a public utility, you need a certificate. So the second thing is, I think perhaps as Justice Thomas would recall, in particular from the Warrenville case, is that if we didn't get a certificate and be subject to statewide regulation, we're going through six counties. We have to get zoning or land use or whatever their particular local requirements are. We've got to get permits from each of those six counties and be regulated by those six counties, and that, as you can see, could very easily lead to inconsistent regulation to an extent that could possibly render the project feasible. This is why, in the Warrenville case and the Geneseo case, it's recognized that regulating facilities of this type is a matter of statewide interest so that they're uniform or regulation compliant. Now, if I could address the eminent domain case, and particularly Justice Burke's question. Mr. McBride, your time has expired, but I'll let you address that, and we have one other question. And you're so lucky because it's on the whole eminent domain thing. You're asking a determination from this Court to vest Rock Island with public utility status and the associated eminent domain power. That's the determination you want from this Court. So my question is, and maybe even Mr. Price or Mr. Reagan can take a stab at it, some would certainly say that this project seems at this point to be highly speculative and filled with many uncertainties and contingencies. And my specific question is, if we believe that to be the case, that there's uncertainty, speculation, contingencies, does that enter into our calculus on whether or not to vest with public utility status and eminent domain power? Just to be clear, we are not asking this Court to grant us eminent domain power, and the Illinois Commerce Commission has not granted us eminent domain power. But you're not saying it wouldn't come along if you get public utility status? I don't know. I've been in this business. I've represented many pipelines and electric transmission companies, and I've been involved with companies that were able to build their projects without acquiring land by compensation. So it's possible, but I've also seen large infrastructure projects built without acquiring their easements through domain. To your question about the uncertainties, many of these uncertainties were raised in the Commerce Commission proceeding. They were litigated. The Commission made a finding that recognizing the arguments that were made about the uncertainties in the business plan, and the Commission found, based on the evidence, that it believed this project had a strong possibility of overcoming those uncertainties and providing substantial benefits for ratepayers. Now, as even ComEd acknowledges in its brief on page 35, no complete certainty can ever be achieved in a project like this. They're all being built based on plans and projections to meet future needs, and those future needs might turn out not to be met. And if that's the case, we've actually got built into both our proposal and a Commission condition that says that you get up to the point where you've gotten all the local approvals and the regulatory approvals and all the engineering and design work done, and you're ready to start construction. If you don't have enough customers signing up for contracts, it turns out for whatever reason, change in law, change in economics, change in demographics, that you can't fill this line and correspondingly then raise the money to build it. You can't proceed. I still haven't addressed Justice Burke's question, but what I just said goes to that because land acquisition, we're not requiring easements. We're not requiring land and feed. People can still farm under the transmission line. But that's a costly undertaking in the total picture here. So, no, we're not going to go out tomorrow and start snapping up easements and exercising eminent domain. We'd have to be much farther along and much more certain that we're able to proceed with the project and have the customers lined up before we would move into that step because it's very expensive. And even if then it turned out for whatever reason that we couldn't proceed with the project, the easements would be released. The typical approach here is you agree on a price for the easement. You pay the landowner 15% to 20% up front. You pay the balance to the landowner right before you start construction. If construction never started, the easement is released, and the landowner gets to keep his money that he's already paid and go about his business. Thank you, Mr. Meehan. Thank you. Counsel, should you need additional time, Mr. Price, I'll be liberal. Thank you, Your Honor. Your Honor, may it please the Court, my name is Matthew Price. On behalf of the Commonwealth Medicine Company, I'll be dividing my time today with Mr. Reagan, the owner of Landowners Alliance. This case presents two statutory questions for the Court concerning Section 3-105's definition of public utility. The first is whether Rock Island's line can be said to be for public use, as the statute requires, and the second is whether Rock Island can claim to own, control, operate, or manage property used or to be used for transmission of electricity. The answer to both questions is no, but before talking about each, I think it's worth taking a step back and reflecting on the nature of public utility regulation in Illinois for a moment. Public utilities have special powers under the law that set them apart from private companies, and these special powers include, most importantly, the power of eminent domain, the power to condemn property, which is the sovereign prerogative of the state, and the sovereign lends that power to the public utility. But that power comes with responsibilities, and one responsibility is an obligation to devote your property to public use rather than just to maximize your own profits. Now, Rock Island didn't need to be a public utility to build a transmission line in Illinois. They didn't need to be, but they chose to try to become one, and the reason we submit has a lot to do with the ability to, if not actually condemn property, at least use the prospect of eminent domain as leverage in order to extract easements from landowners whose properties are on the line. Rock Island wants the benefits of being a public utility, but it's not willing to undertake all the obligations, and so with that, let me turn to the first issue, our argument that Rock Island's line is not for public use. And there are three points I'd like to make about this. The first is that this is an issue of law that should be decided de novo by this court. You heard the ICC counsel talk about substantial evidence and so forth, but the facts here are undisputed. There's no challenge that we're raising to any commission fact-finding. The facts that our case is based on are the facts given by Rock Island's own witness set forth at Rock Island appendix page 319. And so this case revolves around the application of a legal standard to undisputed facts. The second point is the basic test for public use has been well-established in this state for over a century. A public utility must furnish its service to all who apply without discrimination and without delay rather than furnish it according to the company's own wishes, and that is from the Highland Dairy case, and it's also reflected in the current statutory language of the 8-101 of the Public Utilities Act. And the upshot is that a utility doesn't get to choose its customers. It takes whoever comes to it, and it furnishes the service to whoever comes, and that's what makes a utility different than a private company that can decide, doesn't want to serve this person, and it makes that decision in light of its own profit maximizing interest. A utility can't do that. Is there a difference between furnishing service and offering service? There is in this sense. When they say offer service, what they mean, and I'll get to this in more detail in a moment, but what they mean is an opportunity to bid in an open season auction. They don't mean, well, if you accept, I'll offer you service. They mean you have an opportunity to bid on equal terms with other bidders in an open season auction, and then we, Rock Island, based on criteria that we establish, get to select which of the auction bidders we're going to do business with. Well, that's a private company deciding who to do business with based on its own wishes, its own priorities, and its own profit maximizing interest, and that's inconsistent with what a public utility does in Illinois. Is it your position that all of this output has to be furnished for public use as opposed to 75% being sold to the merchants, to the generators at the outset? We have no problem with 75% being sold under privately negotiated contracts. Our argument concerns what happens to the remaining 25%. And, you know, Rock Island makes no argument that the 75% qualifies as public use. So the case is really about the 25%, and maybe it would be helpful if I skipped to what happens with that 25%. It's an open season auction. Now, Rock Island, frankly, is a bit unclear, or maybe cagey, about exactly what criteria it's going to apply in this open season auction. But the way these work is that the developer sets up criteria, and these criteria are known, but they're criteria that are in the developer's interest, and it accepts bids. And criteria might include things like the financial return to the developer, the length of the contract term, the bidder's willingness to accept standard contract terms, and so forth. It receives bids, and then it, according to its predetermined criteria, decides, well, who are the winners? Who will I do business with? The bidders are ranked, and then Rock Island selects them. Then the winners get service, and the losers don't. And that is not public use. Rock Island is not furnishing its service to all who apply. It is having a competitive process, and then using its own criteria, picking who it's going to serve. And that is, under Highland Dairy, just not the way public utilities act in Illinois. And, you know, we heard co-counsel talk about the fact that Rock Island's customers may then resell power to the general public, but that is not sufficient to establish public use either. And in the Mississippi River case, if you look at the facts, the Mississippi River was selling to 23 industrial customers, but it was also selling to two wholesale gas suppliers that would then resell gas to the general public. And the fact that it was doing that was not sufficient to make it a public utility, because the question is, who is the public that's buying from you, and are you willing to sell to any member of that public who comes to you? And Rock Island is not willing to do that. Now, I also think it's worth emphasizing that their position is really inconsistent with this Court's approach to thinking about the term public use as it arises in the eminent domain context. It's the same statutory words as the constitutional text, and that shouldn't be surprising given the close linkage between what a public utility can do in terms of exercising eminent domain. And in cases like the Southwest Illinois Development Authority case from 2002, it holds that for property to be in public use in the takings context, the public needs to be entitled to use the property by right and not just by permission of the owner. And again, that is something that Rock Island is not willing to do. It wants to decide, well, which of these bidders will we provide our service to? Now, Justice Carmar, you asked about the idea of an equal opportunity to bid or participate in an auction, and I've explained why the opportunity to bid is not the same as actually the opportunity to have the service furnished to you. And I think a hypothetical is useful to explore this. Imagine if ComEd, an electric utility in Northern Illinois, said, you know, instead of offering electric service to anyone in our service territory, what we're going to do is we have a defined amount of capacity, and we're going to have an auction, and we're going to rank the order of residents based on certain criteria that serve our purposes, and we're going to pick the ones who win, and the ones who win get electricity, and the ones who don't have to live in the dark. I mean, that would be outrageous and completely inconsistent with what a public utility's obligations are, but that is essentially the position they're taking about what public use means, and I don't think the court should head down the road of accepting that notion of what it means to serve the public. And no case supports their contentions. The Iowa RCO case, which is the main case that my colleagues on the other side rely upon, makes very clear on page 1118 that in that case there was testimony that was presented that companies, non-affiliated companies that wanted to use the pipeline were allowed to use the pipeline, and so there was no question in that case that the pipeline was furnishing service to anyone who wanted to use it. In this case, again, the contrast couldn't be more stark. Rock Island is not doing that. It's selecting the winners of this auction process. ICC counsel also referred to the FERC approval of the tariff as non-discriminatory, and I think it's important to understand that what non-discrimination means for purposes of FERC and the land of FERC is different than what non-discriminatory means in the land of Lincoln under Illinois law. And for FERC, non-discriminatory just means that Rock Island is going to evaluate bids based on certain criteria that it sets forth in advance that are not arbitrary. And, for example, it can't arbitrarily prefer affiliates over non-affiliates or wind generators over other types of generators. But it's allowed, and indeed FERC says, but you may, for purposes of our rates, you may select the people who promote your profit-maximizing interest. Illinois law is different. Non-discrimination in Illinois means you can't distinguish between two customers who are of the same type. You can't say, I'm going to give service to one and not to the other. You can't say, I'm going to charge more to one customer than to a different customer. And that's in Section 9-241 of the Public Utilities Act. So non-discrimination under Illinois law means something very different than what FERC means. And really, FERC's approval of this auction process is a red herring, and the court shouldn't be fooled by that. And so according to your theory here in terms of discrimination or non-discrimination, what happens when there is limited capacity? We have here this idea of this tube or how we're going to envision the wind rushing through or whatever, and there's just so much capacity. And so therefore, it cannot be open to unlimited numbers because it can only serve a certain amount of numbers. Is there something unique about this kind of pipeline idea that might be different from anyone who wants to, you know, buy a contract with Verizon or something? Well, I think two things happen. The first thing that happens is that what it means to furnish service to all who apply, if there's limited capacity, it means you prorate the service. So everyone gets to use it. They just have to use it less than they might otherwise like to use it because there's a limited capacity. That's one way of handling it. And the second way of handling it is that you immediately make a commitment to expand your wire, your capacity, so that you can actually serve everyone who needs it. And I think in connection with this, Rock Island has never said that it makes a commitment to expand its line. It says that if it's obligated to, it won't object. But that's very different than actually making an affirmative commitment to expand its capacity. And the ICC, Rock Island's reply brief at page 11 quotes its own arguments to the ICC instead of the ICC's holding on this issue. If you look at the ICC's holding on this issue, which is at page 28 of the ICC order, Rock Island told FERC that it would not be able to resize the project if demand was greater than expected. And you can find that in the Rock Island appendix, page 336, at paragraph 22, and again at paragraph 33, and that's noted by the ICC in its order. And a subsequent FERC order did say that transmission developers have to expand their lines, but that is an order that is prospective only. It doesn't apply to Rock Island, and there's no indication that FERC would necessarily apply it to Rock Island. And Rock Island has made no commitment at all that it will, in fact, expand its line if demand is greater than capacity. So I think that distinguishes them from how an ordinary public utility would handle the situation that you identified, Justice Tyson. Now, I do want to save a few minutes to – let me – one more note, which is that Rock Island does say that if we have any leftovers, we'll serve the general public with them. And I just want to point out that that is not sufficient to have public utility status, to say, well, our goal is to sell it all out through the folks that we select, but if there's any left, well, then we'll offer it to anyone who wants. That's no different than any other private business. And, again, what makes public utility special is the duty to serve the public and devote your property to public use. Mr. Price, did the appellate court give any deference to the ICC's fact-finding? Well, again, Your Honor, I would submit that the appellate court's decision is a decision about the law. The facts aren't in dispute here. The facts are as Rock Island says they are, and the question is, what does the law require in light of those facts? And I think the appellate court is best read as making a legal ruling about what public use means in light of this court's precedents, in light of the statute, and in light of public policy. Turning to the second issue, whether Rock Island can claim to own, control, operate, or manage property used or to be used in connection with electricity transmission. Justice Thomas, you asked about uncertainties, and I think this is an important point. Rock Island, to be a public utility, Rock Island needs to make a commitment, and that commitment is, on the record as we have it today, we will build. Our property will be used or to be used to transmit electricity. And they've never made that commitment, and the ICC never made such a finding. And the ICC needed to make that finding. And the reason why, instead, Rock Island says, well, we might be, and you heard Mr. McBride say this, well, you know, we don't know whether we're going to get the market interest in our line, so we don't know whether we're actually going to use eminent domain to condemn any properties. Well, in the meantime, the landowners who are on this route are sitting under this cloud, wondering whether their properties are going to be taken. And the reason the statute requires a commitment is because the General Assembly has tried to balance various interests here, the interest of the public at large, the interest of landowners who are going to be under a cloud of uncertainty until a project goes forward or doesn't go forward, and the interest of private developers. And that balance is struck in a way that requires a real commitment by a developer. And you can see that from the change in the statute, the previous statute until 1967, and this is discussed in the Illinois Agricultural Association brief at page 21. The previous statute said that an entity that now or hereafter may own property used or to be used. And they may. So there was a possibility that it would be used in a particular way. Well, the General Assembly removed that may. It eliminated it. And now it requires that the property is to be used to transmit electricity. And the ICC essentially wants to reinsert that language into the statute that the General Assembly removed. Now, the commission never made the finding, and it couldn't have made the finding, that on this record, Rock Island will build. Because Rock Island's own witnesses acknowledged that they're not going to start actually commencing construction until the project is fully established through what they call the market test of transmission customers contracting for sufficient service. In other words, until Rock Island could be sure that it would make a sufficient profit from this to make it worth going forward on. And that is not the way a public utility behaves. A public utility responds to demonstrated need, and it builds a line in response to that need, not whether the line is going to maximize its profits. I want to – the ICC also noted this catch-22 idea, that you don't need to be a public utility at the time of application. And I want to be clear, that's not our argument. We're not contending that you need to be a public utility at the time you apply. A proposed project is okay. The issue here is that you need to be a proposed project that makes a commitment to go forward, and that's what Rock Island has always refused to do. Well, to finish where I started and leave time for my co-counsel, public utilities have special powers but also special obligations that set them apart from ordinary businesses, and they don't get to choose their customers. That's, I think, the bottom line theme that I'd like the court to take away. They don't get to choose their customers, but yet that's what Rock Island wants to do. And in the takings context, the court has found no public use when a private venture may be open to the public but not by right. And that type of private venture, the court said, is designed to result not in public use but in private profits. And I think that describes Rock Island's proposal to a T. And under the plain statutory language of Section 3-105 in cases like Highland Dairy that are long established, Rock Island is not a public utility, and the appellate court's decision should be affirmed. I do want to note that if the court disagrees and wishes to reverse the appellate court's decision, the appropriate disposition would not be to affirm the commission's order. There were other issues that were raised at the appellate court relating to the substantial evidence supporting the commission's factual findings that were never passed on by the appellate court because the appellate court didn't find it necessary to reach those issues. So the appropriate disposition in that case would be to remand for further proceedings, but we think the appellate court should be affirmed. Thank you. May it please the court. Counsel, my name is Mike Reagan, and together with William Shea, we represent and intervener in the Illinois Landowners' Alliance. The Landowners' Alliance has proposed primarily 300 landowners and farmers who are directly impacted by the project. It is not an exaggeration to say that they farm some of the best farm ground on the entire planet. The testimony of Paul Marshall found that the Alliance Exhibit 1.0 eloquently sets out in depth the critical interests of the farmers and on the basis of enduring damage to the land and its crop-producing potential and to their cultural and heritage interests. But I wish to speak here today about the particular substantive and procedural importance of this appeal to the farmers and the owners. And that importance was brought into great relief by the appellants in response to the Alliance's assertion of the members' constitutional right to be free from unjustified takings by a flawed regulatory process. Rock Island, the ICC, and the other appellants responded that the farmers do not have any cognizable element of the main interest here in this appeal. And that Rock Island will have to get two more orders from the ICC, Sections 8-503 and 8-509 of the Public Utility Act. And, this is what they say, in a later eminent domain case, a landowner could contest whether the acquisition is primarily for a public purpose. However, neither Rock Island nor the IBEW makes mention of, and the other interveners downplay, the adverse express statutory presumption which comes into prominent force automatically by the mere grant of the CPCM. The Eminent Domain Act now states that a public, that a finding of public convenience and necessity, that is, the issuance of the CPCM, under the Public Utilities Act, creates a rebuttable presumption that the acquisition of the property, one, is primarily for the benefit of the public, and two, is necessary for a public purpose. Enbridge Energy v. Kerr, a fourth district in 2016, went on to hold that that presumption, which is in the Eminent Domain Act, saying that the mere issuance of the CPCM dictates the conclusion of public use, is a strong presumption within the law of evidence, and secondly, that that strong presumption can only be overcome by clear, convincing evidence. In addition, none of the appellants note that the findings necessary to the issuance of a CPCM, meaning what the public, what the ICC has supposedly already found, are never examined again by the ICC for any subsequent orders, including leading up to the ultimate, the 8-509. They simply, with respect, rubber stamp their prior finding, and there is no statutory opportunity to relitigate that there. So it is precisely because of the appellant's arguments, which they raise against us, that it is essential that close consideration be given now by this court to whether this speculative private project should be given public utility status. One sentence, if I may, please, or Justice Thomas counted one time, I believe, so one paragraph, please. Farmers recognize that their land and family heritage might be at risk when the public necessity legitimately requires it. But their land and heritage should not be put at risk, or here in a state of highly contingent uncertainty, for an indefinitely prolonged period of time, when the claimed service of the public need is so speculative, as is the case with this private project. Thank you. Thank you, Mr. Reagan. Mr. Harvey. You have five minutes. I will take three, Your Honor, and give the remainder to Mr. McBride. In response to Mr. Price, respectfully, facts are very much in dispute here, and this is a matter submitted properly to the commission's deference. Here, the question of whether Rock Island Cleanline is a public utility, again, turns on the question of whether Rock Island offers its services for public use without undue discrimination. That, in turn, depends on how the open access tariff is interpreted and whether that is, in fact, a public use within the meaning of Illinois state law. And Mr. Price is correct in asserting that there may not be 100% congruence between a federal finding and a state finding, and that's why the commission reviewed the conditions and incidents of the open access tariff and determined that, as a fact, this was non-discriminatory within the meaning of Illinois law as well. And I would refer this report to Austin Transfer Company versus Bloom, wherein it was determined that, indeed, this is a fact, a factual question. Likewise, Produce Terminal Market versus Illinois Commerce Commission, a case in which it was determined that whether an offer is for the public use is a question of fact, and that's a fact upon which the commission is entitled to deference. It determined that, indeed, within the meaning of Illinois law as well as federal law, this offering was not discriminatory in a public use. And I will yield the remainder of my time to Mr. McBride unless there are questions. Thank you very much. Thank you, Your Honors. First of all, Mr. Price is incorrect in saying we're not relying on 75%. As I said earlier, the 75% is part of the public, and it's the public, again, most interested in this project and this service. This is bulk power transmission. It's big players in the industry, generators, load-shipping entities, are the ones most likely to use it. Now, retail customers can use it. Those retail customers, again, because of the size of the transactions, are very unlikely to be me and my wife and Justice Tyson and your household. It's going to be big governmental and institutional users, but they are retail customers. The city of Chicago is a retail customer for all its facilities. As a hypothetical example, the University of Chicago could be a retail customer for all its facilities. The argument is made that the decision as to which one of those entities will be able to use this limited amount of capacity is not a question of public use, is the argument, but rather ultimately it's Rock Island who makes the choice which of these entities gets the bid, gets awarded the bid. Well, you hit on it in one of your earlier questions. We have the problem of finite capacity. I mean, I guess we'll be overjoyed if we in fact have more requests for service with the capacity aligned, but yes, we have to have a way to determine if there are more requests for service than the capacity can accommodate, how do we allocate that? FERC required us to set forth a set of objective criteria and procedures that everyone will know that we would apply. Actually, Mr. Price touched on another one. One of the things we could do is pro-rate everyone's request so that everyone gets capacity in a lesser amount. Request capacity gets service, but in a lesser amount than they requested, but all who made a request do get service. And FERC actually has a procedure. We have to file reports after this is all done and contracts have been signed identifying who requested, who received service, what criteria were applied. FERC reviews that to make sure there was no discrimination. People can file complaints at the FDRC. I think they could file complaints at the ICC also if they felt that we were not applying this in a way that was consistent with the public use concept. Now, in terms of the commitment to expand the project, first of all, this issue was never raised in the hearings. No one testified about this. This came up for the first time in another party's brief, so we had a response solely in a brief. Yes, we quoted our position in our brief because that's our commitment. We told the commission in our brief, we're committing to come back to you and expand this project if it's required. The phrase Mr. Price read where we said to FERC we can't resize the project, that's because we have an application to the ICC to build a 3,500 megawatt transmission line, 660 volts. We can't come to the Illinois Commerce Commission and say please grant us authority to build a transmission line of undefined scope and capacity. No, we have to come to them with specifics. If it turns out we need more capacity, we have to go back to the Commerce Commission and get authority to either build another line or somehow enlarge the capacity of this line, which may require enlarging the physical structure. At that time, the Commerce Commission could decide your second project is not justified, it's not economic. So we have a commitment to seek to expand the capacity if need be, but we would have to go to the commission and there's no guarantee that they would grant it. But making the choices among the many, you would hope, potential customers here, the choice of the queues, or let me say the choice of who will be able to be the first ones in, that ultimately rests with Rock Island to say yes to some and say no to others, correct? Based on the criteria we stated. Based on the application of the criteria we stated. And no, we haven't talked about what those are, but they include things like the customer's requested contract length, customer's credit worthiness, which is, you know, that's always taken into account in public utility service generally. Whether the customer is ready to take service when the line goes into operation. So in other words, if someone says, I want service but I don't need it for two years after you're in operation, and someone else says, I need service now, number two would get preference over number one. So there are objective factors that FERC has found, applying its required standard of just, reasonable, and non-discriminatory, not duly discriminatory, meet that standard. And the Commerce Commission applied its standards and determined that the same approach is satisfied for public use requirement. So we would respectfully suggest there was no reason for the appellate court to second-guess the expert judgment of these two regulatory agencies with expertise and authority in the subject matter. Again, at the end of the day, we have to, in some manner, determine how to allocate this capacity. If I understood Mr. Price correctly, he said that non-discrimination under Illinois law may be different than under the Federal Energy Regulatory Commission. Do you agree or disagree, or are you subject to both? Well, we're definitely subject to both. I don't agree with his distinction. The standard for both is not unduly discrimination and not unduly discriminatory. And the case law in Illinois, the test is not discrimination. It's unduly discrimination. There's lots of cases in which customers, for example, are charged different rates or provided different services, and it's held to be not unduly discrimination because there's a legitimate underlying distinction or differentiation. With respect to Mr. Reagan's argument, I just want to note that the case law, over many years, says that a certificate of public convenience and necessity either grants property rights to the certificate holder or takes property rights away from the landowners. And that's the point we were making in our brief. I would note that that was held quite explicitly just within the last two years by the Fourth District Appellate Court in the Adams County case, which the opponents didn't even mention in their briefs. They didn't bring it to your attention. They made no attempt to explain why it didn't apply here. But that's what the Supreme and the Appellate Courts have said on this topic. Thank you for your attention. Thank you. Case Numbers 121, 302, 304, 305, and 308 will be taken under advisement as Agenda Number 15. Mr. Harvey, Mr. McBride, Mr. Price, and Mr. Reagan, we thank you for your arguments. You are excused at this time. Mr. Marshall, the Supreme Court stands adjourned to Court of Appeals.